APRIL L. HOLLINGSWORTH (Bar No. 9391)
KATIE PANZER (Bar No. 16919)
**HOLLINGSWORTH LAW OFFICE, LLC**
1881 South 900 East
Salt Lake City, Utah 84105
Telephone: 801-415-9909
april@aprilhollingsworthlaw.com
katie@aprilhollingsworthlaw.com
Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **TAYLOR SCRUGGS,**<br><br>**Plaintiff,**<br><br>v.<br><br>**UNIFIED POLICE DEPARTMENT GREATER SALT LAKE, UTAH RETIREMENT SYSTEMS MEMBERSHIP COUNCIL, BRENT ATKINSON and MARTY PETERSON**<br><br>**Defendants.** | **COMPLAINT AND JURY DEMAND**<br><br>Case no. _____<br><br>**Judge:** |

## PRELIMINARY STATEMENT

1. This is an action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII"), Title I of the Civil Rights Act of 1991, 42 U.S.C. § 1981a, and the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §12101, et seq. ("ADA").

2. Plaintiff Taylor Scruggs experienced escalating and unrelenting discrimination and harassment because of sex, gender, gender identity, gender expression, and disability by the employees and managers of Defendant Unified Police Department of Greater Salt Lake as set forth below.

3. Plaintiff Taylor Scruggs was also retaliated against for his protected activities under 42 U.S.C. § 2000e and 42 U.S.C. § 12101 by defendants.

**PARTIES**

4.  Plaintiff Taylor Scruggs ("Plaintiff") was employed by the Defendant Unified Police Department of Greater Salt Lake as a Detective.

5.  Mr. Scruggs is a resident of Salt Lake County, Utah.

6.  Defendant Unified Police Department of Greater Salt Lake ("UPD") is an organized and existing department of the government of Salt Lake County and is an employer as that term is defined by Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g) and (h). At all times relevant herein, Defendant employed more than 500 employees.

7.  Defendant Mr. Marty Peterson is the Chairman of the Utah Retirement Systems ("URS") Membership Council.

8.  Defendant Utah Retirement Systems Membership Council is the directorial board of Utah Retirement Systems, a component unit of the State of Utah which provides insurance benefits to public employees in Utah, including the Public Employee Health Plan ("PEHP") through which Mr. Scruggs received health insurance.

**PROCEDURAL HISTORY**

9.  Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC" or "Commission") alleging violations of Title VII and the ADA against Defendant UPD, including discrimination based on sex, gender identity, and disability and retaliation on or about October 7, 2019.

10. On January 17, 2020 the Department of Justice mailed Plaintiff a Notice of Right to Sue, attached hereto as Exhibit A.

11. The Notice of Right to Sue was received by Plaintiff on January 22, 2020.

12. Plaintiff took all necessary steps to exhaust his administrative remedies.

13. Plaintiff took all necessary steps to fulfill all conditions precedent to the commencement of this lawsuit.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the action is based on Title VII of the Civil Rights Act and the ADA and pursuant to 28 U.S.C. § 1337 because the action is based on federal statutes regulating commerce.

15. Venue is proper in the United States District Court for the District of Utah pursuant to 28 U.S.C. §§ 1391(b)(2) because a substantial part of the unlawful employment practices is alleged to have been committed within the United States District Court for the District of Utah.

16. Venue is proper pursuant to 42 U.S.C. § 2000e-5(f)(3) because the unlawful employment practices are alleged to have been committed within the United States District Court for the District of Utah.

17. A substantial part of the events or omissions giving rise to the claims herein occurred in the Central Division.

## FACTS

18. Plaintiff Taylor Scruggs is a male citizen of the United States.

19. Plaintiff has a male gender identity.

20. Plaintiff has a male gender expression.

21. Plaintiff is a man who is transgender.

**Sex, Gender, Gender Expression, and Gender Identity**

22. *Sex* is a term that includes physical sex characteristics, gender, gender expression, and gender identity within its meaning.

23. *Sex stereotyping* refers to the application by an employer of stereotypes related to sex to restrict, disparage, or discriminate on the basis of an employee's sex, gender expression or identity.

24. *Gender* refers to cultural expectations specific to the sexes.

25. *Gender expression* refers to a person's gender-related appearance and behavior, whether or not stereotypically associated with the person's sex assigned at birth.

**Transgender, Gender Dysphoria, and Transition-Related Health Care**

26. A transgender person is someone whose sex assigned at birth, as determined by the appearance of external sex characteristics, does not match that person's innate, internal sense of being male, female, or some other category (often referred to as "gender identity"). Most of the time, people born with male external characteristics experience themselves as male, and those with female external characteristics experience themselves as female. However, for a transgender person, their external characteristics and their internal perception of sex do not match.

27. It is appropriate to refer to a transgender man who has transitioned with male titles, honorifics (e.g., Mr.), and pronouns (e.g., his, him, and he).

28. Discrimination against transgender people for being transgender is based on their sex, sex stereotyping, gender, and gender expression.

29. Being transgender bears no relation to ability to perform or contribute to society. People who are transgender have no impairment in judgment, stability, reliability, or general social or vocational capabilities solely because of their transgender status.

30. Transgender people face stigma and discrimination across all areas of life, from employment, to housing, to health care and public accommodations. The 2015 U.S. Transgender Survey Utah State Report illuminates the issues facing transgender Utahns.[1] One out of eight report losing a job due to their gender identity or expression. Of those who are employed, nearly a third reported being fired, not hired, or denied a promotion for being transgender; and large percentages reported other forms of mistreatment, including being denied appropriate restrooms, told they had to hide their transgender status at work, verbally harassed, or physically or sexually assaulted. This widespread discrimination leads transgender people to have unemployment and poverty rates nearly twice the national average.

---

[1] National Center for Transgender Equality, 2015 U.S. Transgender Survey: Utah State Report (2017), https://www.transequality.org/sites/default/files/docs/usts/USTSUTStateReport%281017%29.pdf.

31. Forty-three percent of transgender Utahns have experienced homelessness at some point in their lives and nearly one in three have been denied housing because of being transgender. Two-thirds have avoided using public restrooms out of fear. One in three report negative experiences with health care providers, including being refused treatment; and one in four did not see a doctor when they needed to due to fear of being mistreated. Onerous bureaucratic requirements prevent most transgender Utahns from obtaining ID documents that correctly reflect their name and gender. This creates a public health and safety hazard: nearly one in three transgender Georgians who have shown such an ID to another have experienced verbal harassment, denial of service, or assault as a result.

32. Transgender people lack political power and have been unable to translate public support into laws to protect themselves from discrimination. On average, public support for explicit protections in statewide employment nondiscrimination laws must reach 81% before such laws can be passed, reflecting a "democratic deficit" when it comes to transgender people.[2]

33. Transgender people commonly experience gender dysphoria.

34. *Gender dysphoria* is the formal diagnosis used by physicians and psychologists to describe people who experience significant distress with the sex they were assigned at birth.

35. Gender dysphoria is found in the *Diagnostic and Statistical Manual of Mental Disorders Fifth Edition* ("DSM-5") of the American Psychiatric Association.

36. Based on many scientific studies during the past two decades, gender dysphoria has been identified as resulting from a physiological condition of the brain and neurological system.

37. Scientific studies have shown that transgender persons have brain structures that are typical of non-transgender people with the same gender identity. For example, transgender men (i.e., individuals whose sex assigned at birth is female but who have male gender identity) have brain structures that are similar to those of non-transgender men.

---

[2] Andrew R. Flores et al., *Transgender inclusion in state non-discrimination policies: The democratic deficit and political powerlessness*, RESEARCH AND POLITICS 1, 1 (2015), https://journals.sagepub.com/doi/pdf/10.1177/2053168015612246.

38. Individuals suffering from gender dysphoria are inherently transgender. Nevertheless, unlike the outdated diagnosis of "gender identity disorder," the hallmark or presenting feature of gender dysphoria is not a person's gender identity per se, but rather the clinically diagnosable distress they experience as a consequence of the incongruence of their assigned and experienced genders.

39. In addition to the negative health conditions directly attributable to gender dysphoria, people with gender dysphoria (as with transgender people generally) are frequently subjected to discrimination in multiple areas of their lives, including health care, housing, employment, school, and interactions with police and other government officials, which exacerbates these negative health outcomes.

40. Like many other medical conditions, gender dysphoria is highly treatable. It is a well-established medical consensus that transition-related medical care, which includes hormonal and surgical treatment to align external sex characteristics with a person's internal sense of sex, is successful in alleviating gender dysphoria.[3]

41. The World Professional Association for Transgender Health ("WPATH"), an interdisciplinary professional and educational organization devoted to transgender health, has established internationally accepted Standards of Care ("SOC") for the treatment of people with gender dysphoria. Major medical and mental health organizations, including the American Medical Association, the Endocrine Society, the American Psychiatric Association, and the American Psychological Association, have endorsed the SOC as the authoritative standards of care.

---

[3] *See, e.g.*, WORLD PROF'L ASS'N FOR TRANSGENDER HEALTH, STANDARDS OF CARE 8 (7th ed. 2012) https://s3.amazonaws.com/amo_hub_content/Association140/files/Standards_of_Care_V7_-_2011_WPATH_(2)(1).pdf ("[H]ormone therapy and surgery have been found to be medically necessary to alleviate gender dysphoria in many people."); DSM-5 at 51 ("[M]any are distressed *if* the desired physical interventions by means of hormones and/or surgery are not available.") (emphasis added); *see also O'Donnabhain v. C.I.R.*, 134 T.C. 34, 69 (U.S. Tax Ct. 2010) (holding that the costs of transition-related care are tax deductible, and stating that "[t]he evidence is clear that a substantial segment of the psychiatric profession has been persuaded of the advisability and efficacy of hormone therapy and sex reassignment surgery as treatment for [gender dysphoria], as have many courts").

42. The treatment for gender dysphoria, as recommended by WPATH, is to assist the person in undergoing a gender transition that will alleviate the distress caused by gender dysphoria and allow the person to live in alignment with their affirmed sex. The transition process has three main components—social, pharmacological, and surgical:

   a. Social transition involves bringing a person's gender expression and social sex role into alignment with their affirmed sex. It may include wearing clothes, using a new name and pronouns, and interacting with peers and one's social environment in a manner that matches the person's affirmed sex.

   b. A physician may also prescribe medications that change the hormone balance in their bodies to be consistent with the person's affirmed sex. For example, a transgender man would be prescribed testosterone, which will masculinize that person's sex characteristics.

   c. Lastly, a transgender person may pursue surgical treatment to alleviate dysphoria caused by having incongruent primary and secondary sex characteristics.

43. Hormone therapy helps to alleviate gender dysphoria in transgender men by changing the predominant sex hormone in the body from estrogen to testosterone. This results in mental health benefits as well as physical changes, including the development and maintenance of male sex characteristics. Common effects include body fat redistribution, increased muscle mass and strength, cessation of periods, and increased growth of body and facial hair.

44. The precise medical treatments required to alleviate a particular individual's gender dysphoria may vary based on the person's individualized medical needs.

**Employment with Defendant UPD**

45. From in or about May 2005 until his unlawful termination on or about June 30, 2019, Plaintiff Mr. Scruggs was employed by Defendant UPD initially as a Deputy, then as a Patrol Officer and later as a Detective.

46. Mr. Scruggs was consistently able to perform the essential functions of his jobs.

47. Mr. Scruggs is a transgender man. Although he was assigned the sex of female at birth based on external physical sex characteristics, he is male.

48. Mr. Scruggs requires doctor-recommended treatment for a medical condition: gender dysphoria. The treatment involves changing sex characteristics from typically female characteristics to typically male characteristics.

49. In January 2015, Plaintiff began to express his male gender identity and in May 2015, began to take testosterone, which masculinized his appearance.

50. In June 2015, Plaintiff Mr. Scruggs applied for the position of property crimes detective and was promoted.

51. His supervisor initially was Sgt. Chad Egan and then after his transfer, Sgt. Brady Cottam. Sgt. Cottam was replaced by Jason Ackerman shortly after Plaintiff transferred.

52. When Ackerman was later promoted to Lieutenant, he was replaced by Sgt. Dave Kochanowski.

53. In or around July 2015, Plaintiff disclosed to Sgt. Brady Cottam, his former supervisor, that he was transitioning and was transgender.

54. He approached Sgt. Cottam as someone he believed to be supportive.

55. In September 2015, Plaintiff had a double mastectomy and male chest reconstruction ("top surgery") to treat his gender dysphoria.

56. Initially, Lt. Ackerman appeared to be supportive of plaintiff. In fall 2015, Lt. Ackerman asked Mr. Scruggs to provide a list of things he would like changed.

57. Plaintiff Mr. Scruggs provided Lt. Ackerman with contact information of an individual who could provide training for his co-workers about gender dysphoria and transitioning. Despite repeated requests from Mr. Scruggs, Lt. Ackerman never followed up and the training was never provided.

58. Plaintiff Mr. Scruggs also requested a gender-neutral bathroom and locker room. This request was made to both Lt. Ackerman and David Warnock, Defendant UPD's Director of Human Resources.

59. Although Warnock told Mr. Scruggs the requests were appropriate and would be implemented, but the requested changes were never made.

60. In or about January 2017, Brent Atkinson became the new Deputy Chief of Police Services for Kearns/Magna precinct. Although Atkinson claimed to be accepting of Mr. Scruggs' identity, he treated Mr. Scruggs differently from other detectives. Atkinson refused to talk to Mr. Scruggs about his cases but discussed cases extensively with non-transgender detectives. Atkinson checked in with the non-transgender detectives to see if they were doing ok and if they needed any help with their cases. Atkinson did not check in with Plaintiff Mr. Scruggs or offer any assistance with his cases.

61. At the weekly detective meetings, Plaintiff Mr. Scruggs was ostracized by his fellow detectives and subjected to snickers and laughter.

62. Sgt. Kochanowski, Plaintiff's first level supervisor, refused to speak to Plaintiff Mr. Scruggs, turned his back to Mr. Scruggs, checked on other detectives' work, but not Mr. Scruggs'.

63. Plaintiff Mr. Scruggs was given lesser assignments and busy work by Sgt. Kochanowski, such as being told to "check on a motorhome park down the street".

64. Sgt. Kochanowski then confronted Plaintiff Mr. Scruggs about his lack of work productivity and told him the other detectives were "doing more work" than he was.

65. Plaintiff Mr. Scruggs responded that he had been successful on numerous cases, including finding five stolen cars and identifying a federal fugitive.

66. Sgt. Kochanowski refused to acknowledge this and told Plaintiff Mr. Scruggs to provide case numbers as proof.

67. Sgt. Kochanowski made fun of Plaintiff Mr. Scruggs' appearance and his clothes in front of other officers.

68. Plaintiff Mr. Scruggs complained to Lt. Ackerman about Sgt. Kochanowski.

69. Lt. Ackerman responded to this by calling him into a room with Sgt. Kochanowski with no notice and telling him that "you two are going to hash this out."

70. In this meeting, Plaintiff asked Sgt. Kochanowski why he was favoring other people and ignoring Plaintiff Mr. Scruggs.

71. Sgt. Kochanowski admitted ignoring Plaintiff and said, "if I ignore you, I don't have to worry about making a mistake" and stated that he did not understand "the transgender thing".

72. Plaintiff's co-workers placed a sign on the bathroom that stated "Men Only" in reference to plaintiff.

73. Defendant UPD discriminated against Plaintiff Mr. Scruggs in case assignments.

74. Plaintiff Mr. Scruggs did not receive credit for his arrests.

75. Plaintiff was isolated and ignored.

76. Plaintiff was subjected continuous course of harassing conduct that included teasing and taunting, misgendering him, and comments made about him in his presence.

77. In January 2017, Mr. Scruggs began to have difficulty sleeping because of the stress of his work situation.

78. Around the same time, as a result of the hostile work environment, Mr. Scruggs developed an alcohol addiction.

79. Mr. Scruggs sought help in March 2017 but his drinking worsened.

80. Defendant UPD operates a health plan for the benefit of participating employees.

81. As part of his overall employment compensation, Mr. Scruggs received health care benefits offered and administered by UPD under the health plan ("Plan"), which was administered by Defendant URS Membership Council through the Public Employees Health Program. As with other Plan participants, he contributed approximately $118 per month of his compensation for health care benefits.

82. Mr. Scruggs' gender dysphoria, left untreated, causes him to experience stress, anxiety, depression, and distress, making it difficult to think, concentrate, and interact with others, including co-workers, romantic partners, and friends.

83. Mr. Scruggs requires gender reassignment surgery to treat his gender dysphoria. He first had a consultation with his surgeon, Isak Goodwin, MD, in September 2017 and another in March 2018. They scheduled surgery for April 30, 2018, at the University of Utah Hospital.

84. In March 2018, Mr. Scruggs went on administrative leave due to severe, debilitating insomnia he was experiencing related to his need for surgery and the uncertainty of insurance coverage. After spending five days in the hospital for treatment, he went back to work.

85. Dr. Goodwin's office submitted a surgery preauthorization request to PEHP, and on May 23, 2018, PEHP issued a denial letter to Dr. Goodwin. PEHP denied Mr. Scruggs' surgery due to an exclusion for "Gender Reassignment Surgery" (the "Exclusion") in the Plan. The letter noted that "[a]ll codes are denied related to this request, regardless of medical necessity."

86. Research indicates that transgender individuals are at a higher risk of substance abuse than the general population. It is common to use substances to self-medicate and attempt to alleviate the symptoms of untreated gender dysphoria. Additionally, transgender people experience high levels of prejudice, discrimination, violence, and other forms of stigma. This results in physical effects including increased cortisol levels, anxiety, depression, suicidality, and self-medicating with substances to cope.

87. In June 2018, Plaintiff Mr. Scruggs asked Lt. Ackerman and Chief Atkinson for help with his alcohol abuse. Although plaintiff requested peer support, on information and belief, Defendants did not convey this request for peer support to the EAP.

88. After two weeks, Plaintiff called EAP and was advised that his request had never been received.

89. In or about July 2018, Plaintiff's psychiatrist recommended he go to rehab. Plaintiff checked into a rehab facility.

90. Plaintiff took administrative leave to do so.

91. While Plaintiff was going through detox, Chief Atkinson called and wanted to know when Plaintiff would return to work.

92. Mr. Scruggs explained to Chief Atkinson that he had just been through detox and that his therapist had recommended rehab.

93. Chief Atkinson demanded a letter stating that Plaintiff could return to work as soon as possible.

94. Mr. Scruggs' therapist confirmed that the plaintiff could not return to work.

95. Chief Atkinson called Plaintiff Mr. Scruggs back to work in spite of this.

96. By ordering Plaintiff back to work against medical advice, Defendant UPD interfered with Plaintiff's recovery, which led proximately to the incident upon which Defendant UPD based its termination of Plaintiff.

97. A week later, Chief Atkinson called again and advised Mr. Scruggs that he was being written up for policy violations, specifically sick leave abuse and training violations.

98. At the end of July 2018, Chief Atkinson advised Mr. Scruggs that he was no longer a detective and was demoted back to patrol.

99. In September 2018, Plaintiff had an adverse reaction to a new drug that he had been prescribed. As a result, he called the UNI crisis line and in the course of the conversation, threatened to kill himself and threatened Lt. Ackerman and Sgt. Kochanowski.

100. Plaintiff's conduct was caused by the drug, which was prescribed because of the emotional toll that Defendant UPD's hostile environment had taken on plaintiff.

101. Plaintiff's conduct was caused by the drug, which was prescribed because of his disability.

102. Police were dispatched to the plaintiff's residence.

103. Plaintiff was not arrested or "pink sheeted" (committed to psychiatric care).

104. Plaintiff Mr. Scruggs, through counsel, submitted an appeal to PEHP on November 19, 2018, appealing the preauthorization denial for his gender reassignment surgery.

105.    On November 21, 2018, through counsel, Mr. Scruggs emailed Harry Souvall, Chief Legal Counsel for UPD. Mr. Scruggs informed Mr. Souvall of his need for surgery to treat his gender dysphoria and the fact that his surgery was being unlawfully denied under the employee health plan.

106.    On or about November 26, 2018, Defendant UPD advised Plaintiff Mr. Scruggs through its attorney, Jonathan Thorne, of its intent to terminate his employment due the incident in early September.

107.    Prior to his termination, Defendants did not refer Plaintiff Mr. Scruggs for a fitness for duty examination.

108.    Mr. Scruggs remained on paid administrative leave until March 2019 when he was formally terminated.

109.    Defendant UPD terminated Plaintiff's employment because of disability related misconduct.

110.    Defendant UPD terminated Plaintiff's employment because of his disability, gender dysphoria.

111.    Defendant UPD terminated Plaintiff's employment because of his disability, alcoholism.

112.    Defendant UPD subjected Plaintiff to a hostile work environment because of his sex, gender, gender identity, and disability.

113.    Defendant UPD accommodated non-transgender employees with alcohol addiction issues.

114.    Defendant UPD accommodated non-transgender employees with disabilities.

**Plaintiff's Need for Care and Defendant's Discriminatory Health Plan**

115.    Since his top surgery, Mr. Scruggs continues to experience distress regarding his remaining female external sex characteristics. Although the medical treatment he has received thus far has been therapeutic, Mr. Scruggs requires additional treatment to fully resolve his gender dysphoria. He continues to experience stress, anxiety, depression, and distress, which he handles as best as he can, but has continued to limit his ability to function socially and professionally. His reproductive, neurological and endocrine functions remain impaired.  He

13

remains a qualified individual with a disability, he has a record of a disability, and he is regarded as having a disability.

116.    He also fears for his safety, given the incongruence between his increasingly masculinized appearance and his remaining typically female characteristics.

117.    To alleviate his gender dysphoria, Mr. Scruggs has decided, upon the recommendation of his endocrinologist, two psychologists, and a surgeon, that genital surgery (also known as "bottom surgery") is the next step in his treatment.

118.    Defendant UPD has exclusive control over setting the terms of, administering, and financing the Plan.

119.    As an employee, Plaintiff was qualified to and did participate in the Plan.

120.    Under the Plan, employees generally receive coverage for their medically-necessary care. The Plan covers services such as laboratory testing, mental health treatment, physician services, anesthesia, and outpatient surgery.

121.    However, the Plan excludes coverage of these same medically necessary services for treating one condition: gender dysphoria.

122.    Plaintiff was denied medically-necessary care under the plan because Defendant UPD adopted a Plan that expressly and deliberately excluded the care he needs. The Plan specifically provides that the medical treatments that Plaintiff's physicians prescribed for him—"Gender Reassignment Surgery" (the "Exclusion")—are carved out and not covered. But for the Exclusion, gender transition-related care would be covered under the Plan on the same terms as other medically necessary care.

123.    Defendant UPD didn't adopt the Exclusion because the excluded care isn't medically necessary or widely recognized as effective, but simply because Defendant UPD seeks to discriminate against employees like Plaintiff. Defendant UPD's adoption of the Exclusion deliberately discriminates for three reasons, each of which is unlawful: first, to injure Plaintiff and others like him, for engaging in conduct—seeking a gender transition—that changes physical sex characteristics from female to male and transgresses gender stereotypes; second,

to deprive Plaintiff and all other UPD employees of coverage for the only treatment known to be effective for a stigmatized medical condition, gender dysphoria, because Defendants disfavor "gender reassignment surgery" and third, to target Plaintiff and other transgender employees for inferior treatment compared to their co-workers.

124.    As a result of Defendant UPD's Exclusion, Plaintiff been forced to forego some medically necessary gender-transition care because he could not afford to pay for it out of pocket without the financial protections afforded by the Plan.

125.    He also suffers distress, humiliation, and a loss of dignity because of this targeted discrimination and Defendants' categorical denigration of him and his medical needs.

126.    While employed, Plaintiff requested that the exclusion be removed, but UPD failed to do so or to provide him with a reasonable accommodation in the form of covering his surgery.

127.    The Plan covers medically necessary hormone replacement therapy, medically necessary genital surgery, and medically necessary genital surgery as treatment for various other health conditions, but it expressly excludes coverage of such treatments when prescribed for gender transition.

128.    Excluding "gender reassignment" treatments is, by definition, an exclusion of gender-transition treatments.  Only services undertaken for the exclusive purpose of changing external sex characteristics from female to male and vice versa are excluded. Thus, the Exclusion targets employees like Mr. Scruggs because they are transgender.

129.    The Exclusion deliberately excludes treatments for gender dysphoria. The only recognized effective treatment for gender dysphoria is gender transition. No other diagnosis other than gender dysphoria uses gender-transition as a treatment. That is, no one without gender dysphoria undergoes gender transition. Thus, the Exclusion targets employees like Mr. Scruggs because they need gender dysphoria treatments.

130.    The Plan contains a generic exclusion for charges that are not medically necessary to treat the condition. Thus gender reassignment services that were undertaken for non-therapeutic

reasons by persons not diagnosed with gender dysphoria would never be covered under the Plan.

131.   Similarly, absent the Exclusion, only medically necessary treatments for gender dysphoria could be covered.

132.   Most people with gender dysphoria undergo gender transition treatment. Excluding treatments because they change sex characteristics therefore also disproportionately affects people who need access to treatments for gender transition for the purpose of treating gender dysphoria.

133.   Mr. Scruggs met all of the clinical criteria set forth in the WPATH Standards of Care policy to qualify for surgical treatment for gender dysphoria, including, inter alia, the capacity to make fully informed decisions and consent to treatment; a diagnosis of gender dysphoria; undergoing hormone therapy for over a year; documentation of having lived openly as male for over a year; not having any other significant medical or mental health issues present; and two referrals from qualified mental health professionals.

134.   The specific procedures that have been prescribed for Mr. Scruggs and for which he seeks coverage would be covered as medically necessary under the Plan but for Defendant UPD's specific decision to deny coverage pursuant to the Exclusion.

135.   Saving money is not a legitimate basis for discrimination on the grounds of sex or disability.

136.   Even if it were, there is no actuarially sound reason to single out and price gender transition coverage separately from all other procedures. The Plan covers other medical conditions that are more widespread and costlier to treat. Gender transition care is not uniquely costly as compared to other forms of healthcare.

137.   The cost of removing an exclusion of medically-necessary treatments for gender dysphoria from a health care plan is insignificant. *See, e.g., Flack v. Wisconsin Dep't of Health Servs.*, No. 18-CV-309-WMC, 2019 WL 3858297, at *5 (W.D. Wis. Aug. 16, 2019) ("[D]efendants estimate that removing the Challenged Exclusion and covering gender-confirming surgeries

would cost between $300,000 and $1.2 million annually. There is no dispute that these amounts are actuarially immaterial as they are equal to approximately 0.008% to 0.03% of the State's $3.9 billion share of Wisconsin Medicaid's $9.7 billion annual budget."); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 1000 (W.D. Wis. 2018) ("From an actuarial perspective, there appears to be no dispute that the cost of coverage is immaterial at 0.1% to 0.2% of the total cost of providing health insurance to state employees, even adopting defendants' cost estimation.").

138.    The cost of the care covered by the Exclusion is in line with other medical treatments. This care also has a low utilization rate, given that transgender people comprise a very small percentage of the population.

139.    The cost of care covered by the Exclusion is also offset by the treatment expenses and morbidities associated with inadequately treated gender dysphoria, including anxiety, depression, substance abuse, HIV incidence, depression, and suicide attempts.

140.    Rescinding the Exclusion would not impair or threaten the Health Plan's solvency.

141.    Actuarial data supports a conclusion that rescinding the Exclusion would not even require the Plan to raise employee or employer contribution rates in order to pay for the care.

142.    Defendant UPD maintains stop-loss insurance that allows it to pay for any claims that are unusually high.

143.    Given the Exclusion, Mr. Scruggs is unable to equally access the fringe benefits offered under the Health Plan without a reasonable accommodation for his disability. Mr. Scruggs' proposed accommodation is coverage of his medically necessary care.

144.    A one-time exception from the Exclusion for Mr. Scruggs would have been an expense on par with comparable forms of healthcare, and would not unduly burden the Health Plan, nor affect its solvency.

145.    Lacking any justified or justifiable reason, the only conceivable purpose of the Exclusion is its effect: to single out transgender people undergoing a gender transition for inferior compensation as compared to their colleagues, and to unlawfully seek to avoid paying for a stigmatized form of health care.

146.    Most transgender people do seek at least some transition-related health care, commonly including a lifelong course of hormone replacement therapy. And only transgender people seek transition-related medical care. Thus, the Exclusion affects only transgender people and, by definition, it affects only those people who seek a gender transition. It also, by definition, excludes the only medically-accepted medical and pharmaceutical treatments for gender dysphoria.

147.    The Exclusion's singling out of people who seek gender dysphoria treatment not only harms their health and their finances, it deepens the stigma attached to being transgender, suffering from gender dysphoria, and seeking a gender transition. It communicates to them and to the public that their local government deems them unworthy of being treated equally and of obtaining the same coverage for medically-necessary healthcare that all other employees receive in exchange for their work.

148.    Plaintiff thus brings this action seeking declaratory and injunctive relief and an award of damages caused by Defendant UPD's discriminatory denial of health care coverage and its failure to accommodate his disability.

### CAUSES OF ACTION

### COUNT 1
### 42 U.S.C. § 2000e, *et seq*.
### Hostile Work Environment Because of Sex
### (Against Defendant Unified Police District)

149.    Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

150.    Plaintiff is a member of a protected category with regard to sex.

151.    Plaintiff is and was qualified to perform the job for which he was employed by Defendant UPD.

152.    After Plaintiff's coworkers, supervisors, and managers were informed of his male gender and male gender expression, Defendant UPD's managers and employees, instituted a campaign

of harassment and discrimination on the basis of sex and sex stereotyping, including gender and gender expression, and adopted adversarial attitudes and hostile demeanors.

153.   This harassment was frequent, severe and pervasive, and physically threatening.

154.   Plaintiff was targeted for harassment and subjected to a hostile work environment by managers and employees because of his sex and sex stereotyping, including gender and gender expression.

155.   The discriminatory acts involved the same type of employment actions, occurred frequently, were perpetuated and/or directed by the same core group of managers and employees, were egregious, numerous and concentrated, and formed part of the same hostile work environment, as detailed herein.

156.   The discriminatory acts were unwelcome to Plaintiff.

157.   Discriminatory intimidation, ridicule, and insult permeated the work environment, and was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and to create an abusive working environment, as detailed herein.

158.   Defendant UPD's managers and employees made statements that demeaned Plaintiff's male gender, and male gender expression, as detailed herein.

159.   Defendant UPD's managers denied the legitimacy of Plaintiff's male gender and male gender expression and encouraged and/or failed to stop others under their direction from doing the same.

160.   This hostile environment unreasonably interfered with Plaintiff's ability to perform his job duties, which flowed directly from Defendant UPD's failure to take prompt and effective action to stop the hostile work environment.

161.   The effects of the hostile environment alleged herein were felt by Plaintiff daily. For instance, Plaintiff felt humiliation and despair as a result of his reasonable fear of continued harassment at any moment, his being referred to continually and intentionally by the wrong name and wrong gender references.

162.   The hostile environment was severe.

163.     Many events contributing to this hostile work environment occurred within the 300-day period prior to Plaintiff's EEOC charge.

164.     Plaintiff perceived the working environment to be abusive or hostile.

165.     A reasonable man in Plaintiff's circumstances would consider the working environment to be abusive or hostile.

166.     Defendant UPD's actions occurred because of Plaintiff's sex in that he was male.

167.     He would not have been the object of harassment but for his gender.

168.     Defendant UPD was on notice of the hostile work environment, including actual notice by means of complaints made by Plaintiff to Lt. Ackerson as detailed herein and vicariously and constructively by means of the acts perpetrated by Defendant UPD's supervisors and managers, as detailed herein.

169.     Defendant UPD did not undertake prompt and effective efforts sufficient to stop the hostile environment detailed herein.

170.     As a direct and proximate result of Defendant UPD's unlawful discrimination, Plaintiff incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, damage to his professional reputation, and other pecuniary and non-pecuniary losses, which damages would not have occurred but for Defendant UPD's unlawful hostile work environment.

**COUNT 2**
**42 U.S.C. § 2000e, *et seq*.**
**Discrimination and Termination Because of Sex**
**(Against Defendant Unified Police District)**

171.     Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

172.     Title VII of the Civil Rights Act of 1964 provides that an employer or agent thereof may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).

173.   Defendant UPD' adoption of the Exclusion violates Title VII by intentionally providing lesser terms of compensation to employees, including Mr. Scruggs, who are seeking a gender transition.

174.   Additionally, Defendant UPD told Plaintiff that he was terminated for misconduct associated with an incident on September 3, 2018.

175.   Defendant did not pose a threat to the safety of others.

176.   Defendant's actions that led to the finding of misconduct were unintentional, caused by medication prescribed by a physician that had a known adverse effect, and which adverse effect caused the Plaintiff to engage in these actions.

177.   The discharge for misconduct was made as a pretext for discrimination because of sex, sex stereotyping and gender, including gender and gender expression, and gender non-conformity.

178.   Other similarly situated gender-conforming employees were not terminated for similar misconduct.

179.   Other gender-conforming employees with similar disabilities and potential risk of direct threat were given reasonable accommodations, assistance with medical needs and additional support and permitted to remain on the force.

180.   But-for Defendant UPD's discrimination based on sex, sex stereotyping and gender against Plaintiff, Plaintiff would not have been discharged.

181.   In the alternative, sex, sex stereotyping and gender were a motivating factor for Plaintiff's discharge, even though other factors also motivated the practice.

182.    As a direct and proximate result of Defendant UPD's illegal discharge of Plaintiff, Plaintiff has incurred damages including but not limited to lost wages, humiliation, emotional distress, loss of enjoyment of life, damage to professional reputation, and other pecuniary and non-pecuniary losses.

**COUNT 3**
**42 U.S.C. § 2000e, et seq.**
**Retaliation**
**(Against Defendant Unified Police District)**

183.    Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

184.    The effect of Defendant UPD's acts complained of above was to deprive Plaintiff of equal employment opportunities as an employee because of retaliation for his complaints of discrimination and/or due to his sex, all in violation of Title VII and Title I of the Civil Rights Act of 1991.

185.    By complaining to Defendant UPD's manager, Ackerman, about the discriminatory practices and hostile work environment described herein and opposing said practices and hostile work environment directed at himself, Plaintiff engaged in activities protected by Title VII.

186.    Plaintiff's exercise of protected rights was known to Defendant UPD.

187.    Following and because of Plaintiff's Title VII protected conduct, Plaintiff was harassed, subjected to a sexually hostile work environment and threatened with and subjected to tangible or adverse employment actions, i.e., his termination.

188.    The actions taken against Plaintiff would dissuade a reasonable employee from making or supporting a complaint of discrimination.

189.    By engaging in the conduct described above, Defendant UPD intentionally retaliated against Plaintiff with malice or reckless indifference to Plaintiff's federally protected rights to oppose practices that are prohibited by Title VII.

190.    As a direct and proximate result of Defendant UPD's unlawful retaliation, Plaintiff has incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, damage to his professional reputation, and other pecuniary and non-pecuniary losses.

**COUNT 4**
**42 U.S.C. § 12112**
**Discrimination and Termination Because of Disability under**
**Title I of the Americans with Disabilities Act**
**(Against Defendant Unified Police District)**

191.    Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

192.    Title I of the Americans with Disabilities Act ("ADA") provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

193.    Title I of the ADA prohibits disparate treatment of a qualified individual with a disability.

194.    Plaintiff was a qualified individual with disabilities, including inter alia gender dysphoria, severe debilitating insomnia, severe anxiety, severe depression, and alcohol addiction.

195.    Defendant UPD was aware of these disabilities.

196.    Defendant UPD had a record of Plaintiff's disabilities.

197.    Defendant UPD regarded Plaintiff as having these disabilities.

198.    Defendant UPD discharged Plaintiff because of these disabilities, because of the record of these disabilities, or because it regarded Plaintiff as disabled.

199.    An employer may justify action taken against an individual with a disability where the individual poses a direct threat to the health or safety of himself or others, referring to "[a] significant risk of substantial harm to health or safety of self or others that cannot be eliminated or reduced by reasonable accommodation."

200.    A determination that a direct threat exists must be based on an individualized assessment of the employee's present ability to perform the essential functions of the job safely,

considering reasonable medical judgment that relies on the most current medical knowledge and/or the best available objective evidence.

201.    Factors that must be considered include: (1) duration of the risk; (2) nature and severity of the potential harm; (3) likelihood the potential harm will occur; (4) imminence of the potential harm.

202.    The availability of any "reasonable accommodation" that would reduce or eliminate the risk of harm must also be considered.

203.    Defendant UPD did not make an individualized assessment of Plaintiff's present ability to perform the essential functions of the job safely in deciding to discharge Plaintiff.

204.    Defendant UPD did not consider reasonable medical judgment that relied on the most current medical knowledge or the best available objective evidence in deciding to discharge Plaintiff.

205.    Defendant UPD did not consider the duration of the risk, the nature and severity of the potential harm, the likelihood the potential harm would occur, or the imminence of the potential harm in deciding to discharge Plaintiff.

206.    Defendant UPD did not consider the availability of any "reasonable accommodation" that would have reduced or eliminated the risk of harm in deciding to discharge Plaintiff.

207.    Plaintiff did not pose a direct threat to the safety of others.

208.    Other employees with similar disabilities and potential risk of direct threat were given reasonable accommodations, assistance with medical needs and additional support and permitted to remain on the force.

209.    But-for Defendant UPD's discrimination based on disability, Plaintiff would not have been discharged.

210.    In the alternative, disability was a motivating factor for Plaintiff's discharge, even though other factors also motivated the practice.

211.    By engaging in the conduct described above, Defendant UPD intentionally discriminated against Plaintiff with malice or reckless indifference to Plaintiff's federally protected rights to oppose practices that are prohibited by the ADA.

212.    As a direct and proximate result of Defendant UPD's unlawful retaliation, Plaintiff has incurred damages including but not limited to lost wages, humiliation, loss of enjoyment of life, emotional distress, damage to his professional reputation, and other pecuniary and non-pecuniary losses.

**COUNT 5**
**42 U.S.C. § 12112**
**Discrimination and Termination Because of Disability under**
**Title I of the Americans with Disabilities Act**
**(Against Defendant Unified Police District)**

213.    Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

214.    Title I of the Americans with Disabilities Act ("ADA") provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

215.    Title I of the ADA prohibits disparate treatment of a qualified individual with a disability, including: (i) "limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee"; (ii) "participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter (such relationship includes a relationship with an employment or referral agency, labor union, an organization providing fringe benefits to an employee of the covered entity, or an organization providing training and apprenticeship programs)"; and (iii) "excluding or

otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(1)-(2), (4); see also 29 C.F.R. §§ 1630.4 - 1630.8.

216.    Title I of the ADA prohibits conduct that has a disparate impact on a qualified individual with a disability, including: (i) "utilizing standards, criteria, or methods of administration . . . that have the effect of discrimination on the basis of disability"; and (ii) "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(3), (6); see also 29 C.F.R. §§ 1630.7, 1630.10.

217.    Defendant UPD's adoption of the Exclusion violates Title I of the ADA by discriminating against Mr. Scruggs on the basis of his gender dysphoria.

218.    Defendant UPD's adoption of the Exclusion also violates Title I of the ADA because it has the effect of discriminating against employees, including Mr. Scruggs, on the basis of gender dysphoria.

**COUNT 6**
**42 U.S.C. § 12112**
**Failure to Make a Reasonable Accommodation in Violation of**
**Title I of the Americans with Disabilities Act**
**(Against Defendants Unified Police District, Utah Retirement Systems Membership**
**Council, and Marty Peterson)**

219.    Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

220.    Title I of the ADA prohibits "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or... denying employment opportunities to a job applicant or employee who is an otherwise

qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant." 42 U.S.C. § 12112(b)(5); see also 29 C.F.R. § 1630.9.

221. 29 C.F.R. § 1630.2(o)(1)(iii) requires "[m]odifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities."

222. Employees enrolled in the Plan who do not have gender dysphoria are able to access medically necessary services under the plan without limitation due to disability.

223. Employees enrolled in the Plan who do not have gender dysphoria can get coverage under the Health Plan for hormone therapy, mastectomies, breast implants, and other surgical modifications of their body for the purpose of treating an illness or disease.

224. Mr. Scruggs is not able to access medically necessary services under the Health Plan because of his gender dysphoria, meaning Mr. Scruggs has been unable to enjoy equal benefits and privileges of employment.

225. Mr. Scruggs informed Defendant UPD of his need for a reasonable accommodation necessary for him to enjoy equal benefits and privileges of employment offered by Defendant UPD, namely a waiver or revocation of the exclusion for gender reassignment surgery.

226. Defendant UPD did not engage in a dialogue about what would constitute a reasonable accommodation or grant his proposed accommodation in the form of making a one-time exception to the general rule that the plan excludes gender reassignment surgery.

227. Making a one-time exception would not financially or otherwise unduly burden the operation of the Plan.

228. Defendant UPD's refusal to grant Mr. Scruggs the requested accommodation of rescinding or waiving the Exclusion violates Title I of the ADA by discriminating against Mr. Scruggs on the basis of his gender dysphoria.

## COUNT 7
### 42 U.S.C. § 1983
### Violation of the Equal Protection Clause of the Fourteenth
### Amendment of the United States Constitution on the Basis of Sex and Gender
### (Against Defendants Utah Retirement Systems Membership Council and Marty Peterson)

229.   Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

230.   The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws."

231.   42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State, . . . subjects, or causes to be subjected, any . . . person within the jurisdiction [of the United States] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress "

232.   Defendants' adoption of the Exclusion has denied and continues to deny Mr. Scruggs equal protection of the laws, by discriminating against him on the basis of sex and gender.


## COUNT 8
### 29 U.S.C. § 2601 et seq.
### Discrimination and Retaliation in Violation of the FMLA
### (Against Defendant United Police District and Defendant Brent Atkinson)

233.   Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

234.   Plaintiff was entitled under FMLA, 29 U.S.C. § 2612, to take up to twelve workweeks of leave during a 12-month period because of his serious health condition.

235.   Plaintiff was eligible for leave under the FMLA because he was employed during at least 12 months and having no fewer than 1,250 hours during such qualifying period.

236.   Defendant UPD discriminating and retaliated against Plaintiff for requesting leave and engaging in other protected activities.

237.    Plaintiff engaged in protected activity by requesting and then taking leave time, as set forth herein.

238.    In or about July 2018, Plaintiff attended an in-patient rehabilitation facility pursuant to his psychiatrist's recommendation, using administrative leave from work.

239.    This triggered Plaintiff's FMLA rights and Defendant's obligation to offer Plaintiff FMLA-protected leave.

240.    Instead of honoring Plaintiff's FMLA rights, Chief Atkinson demanded a letter stating that Plaintiff could return to work as soon as possible.

241.    Mr. Scruggs' therapist confirmed that the plaintiff could not return to work, and Plaintiff so advised Defendant, including Chief Atkinson.

242.    Nonetheless, Chief Atkinson called Plaintiff Mr. Scruggs back to work.

243.    A week later, Chief Atkinson advised Mr. Scruggs that he was being written up for policy violations—specifically sick leave abuse and training violations—because of his absences in connection with attending rehab.

244.    At the end of July 2018, Chief Atkinson advised Mr. Scruggs that he was no longer a detective and was demoted back to patrol.

245.    By ordering Plaintiff back to work, writing him up for sick leave abuse and training violations, and demoting him, Defendant UPD interfered with Plaintiff's FMLA rights and retaliated against Plaintiff for attempting to exercise his rights under the FMLA.

246.    By ordering Plaintiff back to work against medical advice, Defendant UPD interfered with Plaintiff's recovery, which led proximately to the incident upon which Defendant UPD based its termination of Plaintiff.

247.    Defendant UPD's decision to terminate Plaintiff's employment was motivated by and causally related to his exercise of his rights under the FMLA.

248.    Pursuant to the FMLA, Defendant UPD is liable for all wages, salary, employee benefits, and other employment compensation Plaintiff has lost due to Defendant UPD's violations of the FMLA, for liquidated damages in accordance with 29 U.S.C. § 2617(a)(1), interest on such losses, plus reasonable costs and expert witness fees, attorney's fees, and such further and additional relief as the Court may order.

**COUNT 9**
**29 U.S.C. § 2601, et seq.**
**Interference in Violation of the FMLA**
**(Against Defendants Unified Police District and Brent Atkinson)**

249.    Plaintiff incorporates the allegations in the preceding paragraphs as if fully set forth herein.

250.    The FMLA, 29 U.S.C. § 2615(a)(1), prohibits employers from interfering with, restraining, or denying the exercise of or the attempt to exercise an employee's rights under the FMLA.

251.    Under 29 CFR § 825.220(b), unlawful interference includes discouraging employees from taking or requesting FMLA leave, or any other action that deters an employee from participating in protected activity under the FMLA.

252.    Defendant UPD's writing up of Plaintiff for sick leave abuse and training violation and its demotion of Plaintiff discouraged and deterred him from requesting or taking any further FMLA leave time.

253.    Defendant UPD's demotion and termination of Plaintiff's employment interfered with his right to take leave time, including intermittent leave time, for his serious medical conditions.

254.     Defendant's demotion and termination of Plaintiff's employment amounted to unlawful interference in violation of 29 U.S.C. § 2615(a)(1).

255.     Pursuant to the FMLA, Defendant UPD is liable for all wages, salary, employee benefits, and other employment compensation Parker has lost due to United's violations of the FMLA, for liquidated damages in accordance with 29 U.S.C. § 2617(a)(1), interest on such losses, plus reasonable costs and expert witness fees, attorney's fees, and such further and additional relief as the Court may order.

## MANDATORY RECOVERY OF ATTORNEY FEES AND COSTS

256.     Plaintiff incorporates by reference all previous paragraphs as if fully set forth herein.

257.     Plaintiff is mandatorily entitled to recover their attorneys' fees and costs pursuant to provisions of Title VII, the ADA, and the FMLA.

258.     Plaintiff is entitled to an award of attorney fees pursuant to the Equal Access to Justice Act, codified at 5 U.S.C. § 504, *et seq*., 28 U.S.C. § 2412 *et seq*., and 28 U.S.C. § 2412 *et seq*.

## JURY DEMAND

259.     Plaintiff hereby demands a trial by jury of all issues triable by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

A.  Declare that the acts, practices, and omissions complained of herein are unlawful and violate Title VII, the ADA, FMLA and the United States Constitution;

B.  Permanently enjoin Defendant UPD, its officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them from engaging in the unlawful conduct of discriminating against employees who are transgender or gender non-conforming;

C.  Order Defendant UPD to institute and carry out policies, practices, programs, and training which provide equal employment opportunities for employees who are transgender or gender non-conforming, and which eradicate the effects of Defendant UPD's past and present unlawful employment practices;

D.  Order other affirmative relief necessary to eradicate the effects of Defendant UPD's unlawful employment practices;

E.  Direct Defendant UPD to reinstate Plaintiff to his position;

F.  Direct Defendants to pay for past and future compensatory pecuniary and non-pecuniary losses resulting from the unlawful practices complained of in the foregoing paragraphs, including emotional pain, suffering, inconvenience, loss of enjoyment of life, and humiliation, in an amount to be determined at trial;

G.  Direct Defendants to pay Plaintiff front and back pay, in an amount to be determined at trial;

H.  A judgment awarding liquidated damages for Defendant UPD's violations of the FMLA in accordance with 29 U.S.C. § 2617;

I.  Direct Defendants to pay punitive damages, in an amount to be determined at trial;

J.  Award Plaintiff's attorneys' fees, costs, and disbursements as provided by law; and

K.  Award such additional relief as justice may require.

Dated: April 17, 2020

Respectfully Submitted,

**HOLLINGSWORTH LAW OFFICE, LLC**

/s/ Katie Panzer
*Attorney for the Plaintiff*